STATE of Minnesota, Respondent,

v.

Ross Adam SAUE, Appellant.

No. A03–1182.

Court of Appeals of Minnesota.

Nov. 2, 2004.

Mike Hatch, Attorney General, Tracy L. Perzel, Assistant Attorney General, St. Paul, MN; and Dwayne Knutsen, Chippewa County Attorney, Montevideo, MN, for respondent.

John M. Stuart, State Public Defender, John E. Mack, Special Assistant Public Defender, Mack & Daby P.A., New London, MN, for appellant.

Considered and decided by WRIGHT, Presiding Judge; RANDALL, Judge; and KALITOWSKI, Judge.

## OPINION

KALITOWSKI, Judge.

Following a jury trial in which he was convicted of third-degree assault, appellant Ross Adam Saue argues that the upward

dispositional and durational sentencing departures were based on judicial findings and therefore violate his Sixth Amendment right to a jury trial under *Blakely v. Washington*, 124 S.Ct. 2531 (2004).

## FACTS

On the night of August 29, 2002, Jeffrey Barrett and Marlee Nebben were confronted by Barrett's landlord, who had been attempting to evict Barrett. After Barrett pulled a knife, the landlord and another man jumped on Barrett, knocked the knife out of his hand, and started punching and beating him. The fight left Barrett "beaten up, bloody, and very angry." Nebben noticed that Barrett had bruises on both of his eyes, an egg-sized lump above one of his eyes, a mouthful of blood, and bruises and scrapes all over his body.

Meanwhile, many people had congregated near the area to watch the fight. After a brief argument between Barrett and Nebben, one of the onlookers chased after Barrett, tackled him, and threw him to the ground. Barrett hit his head on the cement, but managed to get up and flee in the direction of the railroad tracks. Four individuals chased after Barrett, and one of them caught up with Barrett by the railroad tracks, where he punched him down to the ground, and kicked him several times in the chest area. Nebben testified that at this point Barrett was "beaten up pretty badly." He had a black eye, a huge bump above his right eye, and his mouth and nose were bleeding. Most of the onlookers left, and Nebben saw Barrett running away.

Some of the onlookers told appellant Ross Saue and another individual, who were riding by in a car, that Barrett had pulled a knife on his landlord and had beaten up his girlfriend. Appellant and the other individual looked for but did not find Barrett. They were subsequently told that someone had spotted Barrett walking down Main Street looking "like he was tired" and "walking really slow." Appellant and four other individuals went looking for Barrett.

When the group spotted Barrett, they confronted him and chased him when he ran. Appellant and two other persons caught up with Barrett in a nearby skateboard park. Appellant told police that he caught Barrett, tackled him, dragged him to the ground, and kneed him in the face. All three proceeded to beat Barrett, kicking and punching him. Barrett was approximately five feet four inches tall and weighed between 117 and 130 pounds. In contrast, the three persons were all approximately six feet tall and weighed about 175 to 200 pounds. At trial, several people testified that at the end of the beating, as the other two persons were walking to the car, appellant stomped on Barrett. Barrett's body jerked forward and then went limp. But appellant testified that he stopped beating Barrett first and then called to the others to stop and leave.

One of the onlookers gave appellant a ride to her home, where he fell asleep. Meanwhile, the other two persons who had previously beaten Barrett returned to the skateboard park, where they picked up Barrett, shoved him into the car, and continued to beat him. Eventually, the two individuals pulled Barrett out of the car, continued beating him on the side of the road, and urinated on him before leaving. Later, the two individuals—with the help of two others—returned to the dirt road, located Barrett's body, drove to a gravel pit pond, and threw Barrett's body in the pond.

The autopsy report concluded that Barrett died of homicidal violence as a result of a beating. At the time of his death, Barrett had a blood alcohol concentration

of .145. Appellant was charged with aiding and abetting second-degree intentional and felony murder, and was later indicted on charges of second-degree unintentional felony murder and first-degree assault.

The jury found appellant guilty of third-degree assault, a lesser-included offense, but acquitted him of all other charges. Prior to sentencing, the state moved for an upward dispositional and durational departure, which appellant opposed. Finding severe aggravating factors and substantial and compelling reasons justifying a durational and dispositional departure, the district court sentenced appellant to 60 months in prison, the statutory maximum sentence. Because appellant had no criminal history points, the presumptive sentence for his third-degree assault conviction was a stayed sentence of one year and one day.

### ISSUES

1. Did the district court violate appellant's right to a jury trial by imposing an upward durational departure based on judicial findings?

2. Did the district court violate appellant's right to a jury trial by imposing an upward dispositional departure based on judicial findings?

### ANALYSIS

### I.

■ Appellant argues that the upward durational departure imposed on him, based on the district court's findings of aggravating factors, violates the Supreme Court's holding in *Blakely v. Washington*, 124 S.Ct. 2531 (2004). *See id.* at 2537 (applying the holding of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) to Washington state sentencing guidelines). A decision to depart from the sentencing guidelines will

not be reversed absent a clear abuse of discretion. *State v. Givens*, 544 N.W.2d 774, 776 (Minn.1996). But appellant's challenge to the sentence imposed on him under the sentencing guidelines raises a constitutional issue. In reviewing a constitutional challenge to a statute, this court applies a de novo standard of review. *State v. Wright*, 588 N.W.2d 166, 168 (Minn.App.1998).

The Minnesota Legislature created the Minnesota Sentencing Guidelines Commission in 1978 to develop sentencing guidelines for the district courts. Minn.Stat. § 244.09, subd. 5 (1978). The guidelines were to be promulgated on or before January 1, 1980, and were to be "advisory to the district court." *Id.* They were to provide for a presumptive sentence and to allow for upward or downward departures of up to 15% from the presumptive sentence. *Id.*, subd. 5(2). Thus, although the Minnesota guidelines are administrative rather than statutory in operation, they were developed under legislative mandate, and established various sentencing procedures for the district courts. *See* Minn. Stat. § 244.09, subd. 5 (2002) (providing that the guidelines are advisory but the sentencing court "shall follow" the guidelines procedures when pronouncing sentence in a felony case).

■ The district court sentenced appellant to an executed sentence of 60 months, which represented an upward dispositional departure and a quintuple upward durational departure from the presumptive stayed sentence of a year and a day. To support the departure, the court cited the particular vulnerability of the victim, the particular cruelty of the acts committed by appellant, and the participation of three or more persons in committing the crime. *See* Minn. Sent. Guidelines II.D.2.b.(1), (2), (10). These aggravating factors, all recognized grounds for departure under the

guidelines, were found by the court to be present here. Appellant argues that under the Sixth Amendment, as interpreted in *Blakely*, he was entitled to a jury determination, based on proof beyond a reasonable doubt, of the presence of these or any other aggravating factors used to increase his sentence. We agree.[1]

In *Blakely*, the Supreme Court held that the greatest sentence a judge can impose is "the maximum sentence [that may be imposed] *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" 124 S.Ct. at 2537 (emphasis in original). The Court found that the defendant has a Sixth Amendment right to a jury determination of any fact, except the fact of a prior conviction, that increases the sentence above this maximum. *Id.* at 2543. The Court, therefore, reversed the 90-month exceptional sentence that had been imposed under Washington state's determinate sentencing scheme and remanded to the Washington Court of Appeals "for further proceedings not inconsistent with this opinion." *Id.* In a dissenting opinion, Justice O'Connor stated that the *Blakely* majority opinion "casts constitutional doubt" over all state guidelines systems, including Minnesota's. *Id.* at 2549.

The Minnesota Sentencing Guidelines are similar in operation to the guidelines in Washington that were at issue in *Blakely*.[2] The Washington guidelines, like Minnesota's, rely on a sentencing grid in which presumptive sentences are determined using two variables: (1) offense severity and (2) offender's criminal history (called "of-

fender score" in Washington). *See* Wash. Rev.Code Ann. § 9.94A.510 (2003). In Washington, like Minnesota, a departure is not mandatory even if the court finds aggravating factors. *See* Wash. Rev.Code Ann. § 9.94A.535 (2003) (providing that court "may" impose an "exceptional sentence" if aggravating factors are found); *see also State v. Mail*, 65 Wash.App. 295, 828 P.2d 70, 72 (1992) (describing departure as an "option" if aggravating factors present); *cf. State v. Garcia*, 302 N.W.2d 643, 647 (Minn.1981) (holding that, under the guidelines, the judge "may" depart if aggravating factors are present), and *State v. Oberg*, 627 N.W.2d 721, 724 (Minn.App. 2001) (noting that, even if mitigating factors are present, the court is not required to depart).

The state argues that, because the Minnesota guidelines are administrative rather than statutory, like the guidelines in Washington, the *Blakely* holding does not apply here. The state cites the discussion in *Blakely* of the legislature's power to label certain facts as either elements of the crime or sentencing factors, 124 S.Ct. at 2539, and argues that the Court's use of the term "statutory" maximum to refer to the maximum sentence that may be imposed based on the jury's findings implies a legislative limit on the sentence. *See id.* at 2537. We disagree. The *Blakely* Court's holding rests on "the need to give intelligible content to the right of jury trial," *id.* at 2538, not on any distinction between legislative and administrative limits on that right. There is no discussion in *Blakely* of legislative authority to set sen-

1. This court has recently held that *Blakely* applies to upward sentencing departures under the Minnesota guidelines. *State v. Conger*, 687 N.W.2d 639 (Minn.App.2004). This appeal, unlike *Conger*, involves a jury verdict rather than a guilty plea.

2. In Washington, the Minnesota Sentencing Guidelines are considered so similar that Minnesota cases on sentencing departures are considered persuasive authority in that state. *In re Breedlove*, 138 Wash.2d 298, 979 P.2d 417, 423 (1999); *State v. Nordby*, 106 Wash.2d 514, 723 P.2d 1117, 1121 n. 1 (1986).

tencing limits that would support a distinction between Washington's statutory guidelines and Minnesota's guidelines, developed under legislative mandate by an administrative agency.

We recognize that some courts have made a distinction between administrative guidelines like Minnesota's and guidelines codified by statute, like those at issue in *Blakely*. The Fifth Circuit has held that *Blakely* alone, at least pending further elaboration of its holding, does not apply to the nonstatutory federal guidelines. *United States v. Pineiro*, 377 F.3d 464, 473 (5th Cir.2004) (holding that *Blakely* has not abolished the importance of the distinction between "United States Code maxima and Guidelines ranges"). But this distinction is subject to debate. *See United States v. Booker*, 375 F.3d 508, 512 (7th Cir.2004) (noting that the *Blakely* dissenters were unable to "identify a meaningful difference" between Washington statutory guidelines and federal administrative guidelines), *cert. granted* 73 U.S.L.W. 3074, 125 S.Ct. 11 (U.S. Aug. 2, 2004); *cf. United States v. Penaranda*, 375 F.3d 238, 243 (2d Cir.2004) (noting that *Apprendi* and *Blakely* both involved legislatively established sentencing limits). And we find no language in the *Blakely* opinion that would limit its holding to legislatively imposed sentencing guidelines codified in state statutes.

The state also points to the adjective "statutory" in the phrase "statutory maximum" that the *Blakely* Court borrowed from *Apprendi*. *See Blakely*, 124 S.Ct. at 2537. The state argues that "statutory" should be read to refer only to the absolute upper end of the sentencing range specified by statute. But *Blakely* appears to reject that distinction, indicating that the "statutory maximum" is "the maximum [sentence the judge] may impose *without*

any additional findings." *Id.* (emphasis in original).

In Minnesota, the concept of presumptive sentences was specifically authorized by the legislature in approving the creation of the guidelines. *See* Minn.Stat. § 244.09, subd. 5(2) (1978). Although the legislature did not itself fix the presumptive sentences that were eventually adopted, it did require the guidelines commission to report to it, and has, in later-enacted statutes, made its own revisions to the presumptive sentences for some offenses. *See* Minn.Stat. § 609.342, subd. 2(b) (2002) (prescribing presumptive sentence of at least 144 months for first-degree criminal sexual conduct). Thus, although not generally prescribed by legislation, the guidelines presumptive sentences are "statutory" in the sense that they were contemplated by the legislature, developed under legislative mandate, and are reviewed by the legislature.

In addition, Minnesota's sentencing guidelines were not only authorized by the legislature, but were developed under close supervision by the legislative body. The legislation authorizing the guidelines provided that departures from the presumptive sentence could be no more than 15%. Minn.Stat. § 244.09, subd. 5(2) (1978). And the statute provides that proposed modifications to the guidelines grid, or changes that would result in a reduction of sentence or early release of an inmate, must be submitted to the legislature. Minn.Stat. § 244.09, subd. 11 (2002). Moreover, while the legislature has not chosen to enact a legislative veto over presumptive sentences, it has, through mandatory minimum sentences and sentencing enhancement statutes, legislatively mandated changes in presumptive sentences. *See* Minn.Stat. §§ 609.108, subd. 1(a) (2002) (providing that a court sentencing a patterned sex offender must impose a sen-

tence of at least double the presumptive sentence), 609.342, subd. 2(b) (prescribing a presumptive sentence of 144 months for first-degree criminal sexual conduct); *see generally* Minn. Sent. Guidelines II.E. (providing that the presumptive duration of a sentence is the statutory mandatory minimum or the presumptive sentence according to the guidelines grid, whichever is longer); *cf. Taylor v. State*, 670 N.W.2d 584, 589–90 (Minn.2003) (considering the statutory changes in presumptive sentences and mandatory sentences for sex crimes in reviewing an upward departure for a sex offense). Thus, the Minnesota Sentencing Guidelines, although developed and modified by an independent administrative agency, are subject to considerable oversight and monitoring by the legislature.

The state also argues that the Minnesota guidelines, unlike the Washington guidelines at issue in *Blakely*, are merely advisory. The state argues that because the legislature has clarified that sentencing under the guidelines is not a "right" accruing to a defendant, the declaration in *Blakely* of a "legal *right* to a lesser sentence," 124 S.Ct. at 2540 (emphasis in original), does not apply in Minnesota.

The relevant statute provides:

Although the sentencing guidelines are advisory to the district court, the court shall follow the procedures of the guidelines when it pronounces sentence in a proceeding to which the guidelines apply.... Sentencing pursuant to the sentencing guidelines is not a right that accrues to a person convicted of a felony; it is a procedure based on state public policy....

Minn.Stat. § 244.09, subd. 5 (2002).

■ This statute provides that the sentencing guidelines do not bind the sentencing court to any particular sentence. But the procedures provided in the guidelines

for arriving at an appropriate sentence must be followed. *Id.; see State v. Hopkins*, 486 N.W.2d 809, 812 (Minn.App.1992) (holding that the guidelines may not be manipulated to justify a sentence arrived at independently by the court). And the presumptive sentence is not merely a suggestion, but a sentence that must be imposed unless the procedures for departure are followed. *See generally State v. Bellanger*, 304 N.W.2d 282, 283 (Minn.1981) (holding that disagreement with the guidelines does not justify departure); *cf. State v. Geller*, 665 N.W.2d 514, 517 (Minn.2003) (holding that the district court must provide reasons for any departure from the presumptive sentence).

As for the statutory reference to a "right" accruing to the defendant, the supreme court held in 1996 that sentencing under the guidelines was a right that could be waived by the defendant. *State v. Givens*, 544 N.W.2d 774, 777 (Minn.1996) (holding that a plea agreement by itself could support a sentencing departure). The following year, the legislature amended Minn.Stat. § 244.09, subd. 5, to provide that sentencing "pursuant to the sentencing guidelines is not a right that accrues" to the defendant. 1997 Minn. Laws ch. 96, § 1; *see State v. Misquadace*, 644 N.W.2d 65, 69 (Minn.2002). As the supreme court recognized in *Misquadace*, the statutory amendment was a response to *Givens* and to its holding that the defendant in the plea agreement could waive his "right" to receive the presumptive sentence, absent grounds for departure. *See Misquadace*, 644 N.W.2d at 69.

But importantly, the 1997 Legislature's concern with whether there was a "waivable right" to the presumptive sentence did not address the constitutional dimension presented in *Blakely*. *See Misquadace*, 644 N.W.2d at 70. The *Blakely* Court's concern, based on the Sixth Amendment, is

that the defendant has a right to a jury trial that includes a right to receive a sentence that the jury's verdict, standing alone, entails. 124 S.Ct. at 2540–41. The 1997 Legislature's concern was whether the presumptive sentence could be waived by the defendant, not whether the defendant had a right to a jury trial before any greater sentence could be imposed. A defendant could have a "right" to receive the presumptive sentence under the guidelines without having any constitutional "right" to a jury trial that extended to the sentencing proceeding. Indeed, at the time of *Givens, Misquadace,* and the 1997 legislative amendment, there was no claim that the right to a jury trial affected the sentence that could be imposed within statutory limits. *See Edwards v. United States,* 523 U.S. 511, 514, 118 S.Ct. 1475, 1477, 140 L.Ed.2d 703 (1998) (approving a sentence imposed under the federal guidelines based solely on judicial findings, regardless of jury's "actual, or assumed, beliefs" about the issue).

The state also argues that because previous United States Supreme Court opinions had approved the use of judicial fact-finding in the federal guidelines, *Blakely* should not be read as applying to nonstatutory guidelines. But this argument ignores the dramatic significance of *Blakely* in stating a new rule of law. Previously, the Court had held that the federal guidelines "do no more than fetter the discretion of sentencing judges to do what they have done for generations—impose sentences within the broad limits established by Congress." *Mistretta v. United States,* 488 U.S. 361, 396, 109 S.Ct. 647, 667, 102 L.Ed.2d 714 (1989). But in *Blakely* the Court rejected the view that the upper end of those "broad limits"—the maximum sentence provided by statute—defined the permissible discretion of sentencing judges. 124 S.Ct. at 2539–40. Instead, the Court held, the presumptive sentence in a determinate sentencing scheme is itself the maximum that the judge may impose without additional jury findings. *See id.* at 2537 (holding that the "statutory maximum" sentence is "the maximum [the court] may impose *without* any additional findings" beyond jury's verdict) (emphasis in original).

Thus, we reject the state's argument that *Blakely* did not establish any fundamental right to have all sentencing facts decided by the jury. The *Blakely* Court did approve indeterminate sentencing schemes in which discretion is vested in the sentencing judge. *Id.* at 2540. But although the judge under an indeterminate sentencing scheme must necessarily consider some facts, the Court held that the judge's discretion in doing so did not come "at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty." *Id.* Under *Blakely,* any sentencing facts "essential to lawful imposition of the penalty," or sentence, must be decided by the jury. *See id.*

The state further argues that even if this court concludes that *Blakely* applies to upward sentencing departures under the Minnesota Sentencing Guidelines, it should construe the statute establishing those guidelines as making them only advisory to the district courts. *See generally State v. Cunningham,* 663 N.W.2d 7, 10 (Minn. App.2003) (holding that a court confronted with an ambiguous statute should adopt that construction which preserves constitutionality of statute). But, as discussed above, we cannot construe the guidelines as being merely advisory to the district courts. Indeed, this court's considerable experience in enforcing the district courts' compliance with the guidelines prevents us from following that course. *See, e.g., State v. Law,* 620 N.W.2d 562, 565 (Minn.App. 2000) (stating that, in this court's "strongly

held judgment," a downward dispositional departure for attempted second-degree murder "constitute[d] an abuse of the lawful parameters of trial-court discretion"), *review denied* (Minn. Dec. 20, 2000); *Hopkins,* 486 N.W.2d at 812 (holding that the sentencing guidelines may not be manipulated to support a sentence that is independently determined by the district court).

■ The departure imposed in this case involves the judicial fact-finding role prohibited by *Blakely.* The district court imposed a quintuple upward departure based on extensive fact findings that appellant argues ignored or contradicted the jury's verdict acquitting him of second-degree felony murder and first-degree assault. Although we need not reach appellant's argument that the sentence negated the jury's verdict, we note that the *Blakely* majority was concerned that the jury "function as circuitbreaker in the State's machinery of justice." 124 S.Ct. at 2539. The jury could not have served that function in this case if its verdict of acquittal on the two greater offenses could be effectively negated by a sentence based on judicial findings.

In conclusion, the imposition of an upward durational departure based on judicial findings here violated appellant's Sixth Amendment right to a jury trial. The durational departure is reversed, and this matter is remanded to the district court for resentencing in accordance with this opinion in such proceedings as the district court deems appropriate.

## II.

Appellant argues that the upward dispositional departure imposed by the district court violates his right to a jury trial under *Blakely.* The district court imposed an executed sentence based on its conclusion that appellant was not amenable to proba-

tion. The court made a number of factual findings concerning appellant's past behavior while on probation, his abuse of alcohol, the findings of a psychological evaluation, and the results of personality testing.

■ *Blakely* involved an increase in the duration of the prison sentence based on judicial findings, not a decision on the proper disposition of the defendant. But appellant argues that because the dispositional departure also relied on additional judge-made findings, it violated his right to a jury trial under *Blakely.* We disagree.

The judicial fact-finding involved in dispositional departures relies on the same subjective assessments on which judges would decide on a sentence under an indeterminate sentencing scheme. In *Blakely,* the majority opinion acknowledged that indeterminate-sentencing schemes "involve judicial factfinding, in that a judge ... may implicitly rule on those facts he deems important to the exercise of his sentencing discretion." 124 S.Ct. at 2540. But this fact-finding is acceptable because

> the facts [found] do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Id.* (emphasis in original).

This court has held that *Blakely* does not apply to dispositional departures imposed under the Minnesota Sentencing Guidelines. *State v. Hanf,* 687 N.W.2d 659 (Minn.App.2004). We find the reasoning of that decision to be persuasive.

Under our sentencing guidelines, "[d]epartures with respect to disposition and duration ... are logically separate decisions." Minn. Sent. Guidelines cmt. II. D.02. The guidelines provide a nonexclusive list of permissible reasons for depar-

ture, without specifying whether these reasons will support dispositional or durational departures, or both. *See id.* II. D.2. But caselaw has developed a separate category of reasons for dispositional departures. *State v. Trog,* 323 N.W.2d 28, 31 (Minn.1982) (holding that a defendant's particular amenability to probation or treatment will justify dispositional departure). Those reasons relate to the individual characteristics of the offender though and may not be used to support a *durational* departure. *See State v. Chaklos,* 528 N.W.2d 225, 228 (Minn.1995).

Thus, dispositional departures in Minnesota have not been governed by the mitigating and aggravating factors listed in the guidelines. Instead, courts have continued to use the same offender characteristics they used before in determining whether the defendant should go to prison. *See Trog,* 323 N.W.2d at 31 (holding that "[n]umerous factors," including age, prior record, remorse, and attitude in court are relevant to whether defendant is particularly amenable to probation). These decisions are often influenced by psychological evaluations, the court's observations of the defendant, recommendations in the presentence investigation (PSI), and other broad considerations, rather than the offense-related factors listed in the guidelines. *See, e.g., State v. Sejnoha,* 512 N.W.2d 597, 600 (Minn.App.1994) (affirming the downward dispositional departure of a sex offender evaluated as amenable to treatment and displaying extreme remorse), *review denied* (Minn. Apr. 21, 1994).

The district court's dispositional departure here involved an open-ended examination of individual offender characteristics. The court relied on the PSI, on observations of appellant's probation officer, and on psychological testing and the conclusions of the psychological evaluation. The

court found that appellant had violated his probation in the past and that he continued to engage in behavior, particularly the use of alcohol, that led to criminal offenses. The court also found that personality testing showed appellant to be egocentric, that he had showed no remorse for the offense, and that he had learned little or nothing from chemical-dependency and anger-management treatment programs.

Because, following *Hanf,* we conclude that the dispositional departure did not violate appellant's right to a jury trial under *Blakely,* we must address appellant's other challenges to the departure. But we note that, just as the durational departure in this case, insofar as it tended to negate the jury's verdict, requires us to apply the rationale of *Blakely,* the dispositional departure, based on facts far removed from the offense elements reflected in that verdict, supports the *Hanf* court's conclusion that *Blakely* does not apply to dispositional departures.

■ Appellant argues that the impact of his prior juvenile and adult misdemeanor offenses should weigh less heavily than the three prior felony convictions it would take to make his sentence a presumptively executed sentence. But this argument ignores the presence of the other *Trog* factors that indicate he is unamenable to probation. And although it may be possible to weigh the seriousness of appellant's past offenses against that of three prior felonies, it is impossible to measure the weight of the other *Trog* factors, mostly subjective in nature, against that of three prior felonies.

The record indicates that appellant has been placed on probation four times but always reoffended. Moreover, this criminal behavior has escalated over time. Although alcohol abuse has played a part in this behavior, appellant has continued to abuse alcohol, refusing to acknowledge

that he has a problem, and has admitted that he did not learn anything from his chemical-dependency and anger-management programs. The PSI noted that appellant had a "callous disregard for others" and that he lacked any "genuine sadness for his behavior." Thus, the record amply supports the district court's conclusion that appellant is unamenable to probation, even without considering the results of personality testing or the conclusions of the psychological evaluation.

Appellant argues that the district court's findings reflect an "animus" against him. But, as discussed above, the court's findings are all supported by the record. Appellant also argues that the factors governing dispositional decisions focus on whether appellant is a risk to public safety, and there is no evidence that he poses such a risk. But appellant provides no authority in support of this argument. The factors governing pretrial release, and release pending appeal, include an assessment of whether the defendant is a risk to public safety. *See* Minn. R.Crim. P. 6.02, subd. 2; 28.02, subd. 7(2). But a defendant's amenability to probation by itself will support a downward dispositional departure. *See State v. Donnay,* 600 N.W.2d 471, 473–74 (Minn.App.1999), *review denied* (Minn. Nov. 17, 1999). And a finding that a defendant is a risk to public safety has not been held to be a prerequisite to finding the defendant unamenable to probation. We conclude that the district court did not abuse its discretion in imposing an upward dispositional departure.

## DECISION

The district court's imposition of an upward durational departure based on judicial findings violated appellant's Sixth Amendment right to trial by jury. The district court's upward dispositional departure did not violate appellant's jury-trial right and was not an abuse of discretion. We remand for resentencing.

**Affirmed in part, reversed in part, and remanded.**